UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER LEDESMA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HISMILE, INC., et al.,<br><br>Defendants. | Case No. 24-cv-03626-KAW<br><br>**ORDER GRANTING HISMILE PTY LTD. MOTION TO DISMISS; GRANTING HISMILE INC. MOTION TO DISMISS; GRANTING DEFENDANTS' MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 29-31 |

Plaintiffs filed the instant putative class action against Defendants Hismile, Inc ("HI"). and Hismile Pty Ltd. ("HPL"), alleging that Defendants engaged in fraudulent marketing of its teeth whitening products, which promise to deliver instant and dramatic results. (First Amend. Compl. ("FAC") ¶ 1, Dkt. No. 18.) Pending before the Court are: (1) HPL's motion to dismiss, (2) Defendants' motion to strike the nationwide class allegations, and (3) HI's motion to dismiss. (HPL Mot. to Dismiss, Dkt. No. 29; Defs.' Mot. to Strike, Dkt. No. 30; HI Mot. to Dismiss, Dkt. No. 31.)

Having considered the parties' filings, the legal authorities, and the arguments made at the July 17, 2025 hearing, the Court: (1) GRANTS HPL's motion to dismiss, (2) GRANTS Defendants' motion to strike, and (3) GRANTS HI's motion to dismiss.

## I.    BACKGROUND

Defendants sell teeth whitening products, including: (1) V34 Colour Corrector Serum, (2) Glostik Tooth Gloss, (3) PAP+ Whitening Strips, and (4) PAP+ Whitening Pen. (FAC ¶ 7.) Defendants allegedly advertise their products through "an aggressive, pervasive, and fraudulent social media marketing scheme, particularly on TikTok, Instagram, and Facebook, by inundating these social media platforms with a high volume of falsified before-and-after images, misleading

celebrity endorsements, and deceptive influencer marketing," as well as by "posting self-sponsored 'customer reviews' of its products and having its own employees pretend to be satisfied customers on various social media and shopping platforms." (FAC ¶ 2.) Examples of these advertisements include:

**Before-and-After Images**: Defendants allegedly create advertisements showing brown solution being applied to a model's teeth before immediately removing it with its products, thus "creat[ing] a more dramatic before-and-after effect." (FAC ¶ 29.) Additionally, many of the advertisements for the V34 Colour Corrector Serum depicting the "after" effect show the product's purple serum while it is still on the models' teeth, giving an illusion that the purple serum cancels out the yellow tones. (FAC ¶ 31.) In actuality, fully rinsing off the product causes the color-correcting effect to disappear entirely. (FAC ¶ 31.) In advertisements for the PAP+ products, Defendants falsely stain very white teeth and then use strips to remove the surface level discoloration. (FAC ¶¶ 32, 33.) Defendants also use unnaturally bright lighting and models who already have very white teeth to exaggerate the before-and-after effect of the Glostik Tooth Gloss. (FAC ¶ 34.)

**False Reviews**: Defendants allegedly post fake positive reviews on Amazon. (FAC ¶¶ 41, 44.) For example, Plaintiffs point to a five-star review for Glostik Tooth Gloss posted by "Jason," who is an actor-employee in many of Defendants' social media videos and advertisements. (FAC ¶ 44.) Defendants also removed negative reviews because it stopped hosting customer reviews on its website after getting numerous negative reviews. (FAC ¶¶ 39-40.)

**Fake Customers**: Defendants allegedly create videos of its employees pretending to be normal consumers, accompanied by a "disclaimer" stating: "Non-permanent. Results may vary. Staff results." (FAC ¶ 47.) In one video, an employee pretends to be answering a comment from another TikTok user, but Plaintiffs assert the comment is not a real comment from another user. (FAC ¶ 48.) Another video claims to depict an "honest, actual review," but is actually made by an employee. (FAC ¶ 50.) Further, Defendants pay influencers to promote its products without disclosing that their posts are advertisements, contrary to TikTok's requirements. (FAC ¶ 51.)

**Misleading Celebrity Endorsements**: Defendants pay celebrities to endorse its products

1    without disclosing that the celebrities already have very white teeth and are not bona fide users of

2    the products.  (FAC ¶ 52.)

3        **Clinically Proven**: Starting in February 2024, Defendants advertised that the V34 Colour

4    Corrector is "clinically proven."  (FAC ¶ 56.)

5        **"Pseudoscience"**: Defendants assert that the V34 Colour Corrector and Glostik Tooth

6    Gloss instantly whiten teeth because of "color correction technology: purple and yellow are

7    complementary colors opposite to each other on the color wheel, so purple 'cancels out yellow

8    undertones' to reveal dramatically whiter teeth."  (FAC ¶ 60.)  Advertisements demonstrate this

9    alleged science "by dipping yellow objects in purple paint, overlaying purple and yellow disks,

10   and making comparisons to purple shampoo which is known to neutralize brassy tones and

11   yellowing in blonde hair."  (FAC ¶ 60.)  Plaintiffs assert, however, that this color theory is

12   inapplicable to stain removal.  (FAC ¶ 62.)  The advertisements include disclaimers that they are

13   "not a real experiment, this is a dramatization showcasing colour theory."  (FAC ¶ 63.)

14   Defendants also stage videos with scenes of "scientists" and "dental professionals" appearing to

15   study the products in professional settings, but the scientists are actors wearing lab coats or dental

16   scrubs while carrying clipboards.  (FAC ¶ 64.)  Other actors dress as dentists to lend false

17   credibility to the "clinically proven" claims and use of "science," including claiming that the V34

18   Colour Corrector can "instantly" conceal stains.  (FAC ¶ 66.)

19       Plaintiffs allege that these advertisements are fraudulent because the products "do not

20   *instantly* or *dramatically* whiten teeth, as advertised."  (FAC ¶ 67.)  Plaintiffs contend that at-

21   home whitening typically requires peroxide, whereas Defendants' products do not contain

22   peroxide.  (FAC ¶¶ 68-70.)  Rather, the PAP+ products contain phthalimidoperoxycaproic acid

23   ("PAP"), which some studies have found to be far less effective than peroxide after 7-10 days.

24   (FAC ¶¶ 71, 75 n.39.)  Defendants, however, advertise that PAP is "just as effective as hydrogen

25   peroxide," and that the PAP+ products deliver the same whitening benefits "instantly."  (FAC ¶

26   74.)

27       Plaintiffs allege that Defendants spend tens of millions of dollars per year on social media

28   posts, mostly aimed at their target market of females between the ages of 15 and 24.  (FAC ¶ 23.)

1    This includes publishing a high volume of videos (typically 15 or more a day), paying influencers

2    and celebrities for sponsored posts, and paying for ads to appear in user feeds.  (FAC ¶ 24.)

3    Thanks to its relentless posting and advertisements, Defendants have amassed 5.2 million

4    followers on the TikTok (@hismile) account, 1.6 million followers on the Instagram (@hismile)

5    account, and 1.7 million followers on the Facebook account.  (FAC ¶ 24.)  Defendants have

6    credited their explosive success -- with Defendants being on track to post $1 billion in sales in

7    2023 -- to its aggressive social media marketing.  (FAC ¶ 23.)

8        Plaintiffs are individual representatives who purchased Defendants' products.  Plaintiff

9    Alexander Ledesma states he "relied on the depictions and promises of instant and dramatic

10   whitening he saw on Hismile's Facebook advertisements and on Hismile's official website,"

11   including having seen approximately sixty advertisements in his Facebook feed before deciding to

12   purchase the V34 Colour Corrector Serum and PAP+ Whitening Pen in or around September

13   2023.  (FAC ¶¶ 11(b), 94(a).)  Plaintiff Ledesma saw before-and-after images showing "scientists"

14   and "dentists" demonstrating that the products could instantly turn teeth white because of the

15   science of color theory, as well as influencer endorsements and images of yellow bananas and

16   rubber ducks turning white after being coated with purple paint.  (FAC ¶ 94(a).)  Plaintiff Helen

17   Tanaka relied on Instagram and TikTok advertisements when she purchased Glostik Tooth Gloss

18   in June 2023 and V34 Colour Corrector Serum in January 2024, including before-and-after images

19   and videos showing instant results, as well as customer reviews and reactions she saw on

20   Defendants' website and in social media comments.  (FAC ¶¶ 12(b), 95(a).)  Plaintiff Larry Jones

21   relied on TikTok and Facebook advertisements when purchasing PAP+ Strips in January 2024,

22   including before-and-after images and videos.  (FAC ¶¶ 13(b), 63(a).)  Finally, Plaintiff

23   Christopher Deuel relied on Instagram advertisements in purchasing the V34 Colour Corrector

24   Serum in April 2024.  (FAC ¶¶ 14(b), 97(a).)  Plaintiff Deuel saw fifteen to twenty

25   advertisements, including before-and-after images and videos, videos demonstrating the science of

26   color theory by wiping purple paint off of yellow objects like bananas and ping pong balls, videos

27   of purported scientists and dentists explaining the science of color theory, videos claiming that the

28   V34 Colour Corrector was clinically proven to instantly whiten teeth, influencer promotions, and

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1 customer reviews.  (FAC ¶ 97(a).)

2      Based on these facts, Plaintiffs filed the operative complaint, bringing claims for: (1)

3 violation of California's Unfair Competition Law ("UCL"); (2) violation of California's False

4 Advertising Law; (3) violation of California's Consumers Legal Remedies Act ("CLRA"); (4)

5 breach of warranty; and (5) unjust enrichment/restitution.  All claims are brought on behalf of a

6 California subclass, while the breach of warranty and unjust enrichment claims are also brought on

7 behalf of a proposed nationwide class.

8      On December 16, 2024, Defendants each filed a motion to dismiss, as well as a joint

9 motion to strike the nationwide claims.  While Defendant HPL moved to dismiss the case for

10 failure to state a claim, Defendant HI moved to dismiss on the additional ground that Plaintiffs

11 lacked standing as to Defendant HI because Defendant HI was not responsible for the social media

12 advertisements at issue.  (HI Mot. to Dismiss at 1.)

13      On February 10, 2025, Plaintiffs filed their oppositions.  (Pls.' Opp'n re HPL Mot. to

14 Dismiss, Dkt. No. 34; Pls.' Opp'n to Defs.' Mot. to Strike, Dkt. No. 35; Pls.' Opp'n to HI Mot. to

15 Dismiss, Dkt. No. 36.)  Plaintiffs also filed a supporting declaration by Bahar Sodaify.  (Sodaify

16 Decl., Dkt. No. 38.)

17      On March 24, 2025, Defendants filed their replies.  (HPL Reply, Dkt. No. 41; Defs.'

18 Reply, Dkt. No. 42; HI Reply, Dkt. No. 44.)

19 **II.    LEGAL STANDARD**

20 **A.    Motion to Dismiss under Rule 12(b)(6)**

21      Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based

22 on the failure to state a claim upon which relief may be granted.  A motion to dismiss under Rule

23 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  *Navarro v. Block*, 250

24 F.3d 729, 732 (9th Cir. 2001).

25      In considering such a motion, a court must "accept as true all of the factual allegations

26 contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation

27 omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or

28 there is an absence of "sufficient factual matter to state a facially plausible claim to relief."

*Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation marks omitted).

A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Threadbare recitals of the elements of a cause of action" and "conclusory statements" are inadequate.  *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.").  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . .  When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations omitted).

### B.    Motion to Strike

Federal Rule of Civil Procedures 12(f) provides that, on its own or on a motion from a party, a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "The purposes of a Rule 12(f) motion is to avoid spending time and money litigating spurious issues." *Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010) (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993)).  "A matter is immaterial if it has no essential or important relationship to the claim for relief pleaded," and "[a] matter is impertinent if it does not pertain and

6

1    is not necessary to the issues in question in the case." *Id.* Motions to strike, however, "are

2    generally disfavored because the motions may be used as delaying tactics and because of the

3    strong policy favoring resolution of the merits." *Id.* (citation omitted). Thus, "[b]efore a motion

4    to strike is granted the court must be convinced that there are no questions of fact, that any

5    questions of law are clear and not in dispute, and that under no set of circumstances could the

6    claim or defense succeed." *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 561 (C.D.

7    Cal. 2005). As with a motion to dismiss, "the court must view the pleading under attack in the

8    light most favorable to the pleader." *Id.* (citation omitted).

9    **C.    Motion to Dismiss under Rule 12(b)(1)**

10        A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant

11    to Federal Rule of Civil Procedure 12(b)(1). A Rule 12(b)(1) motion tests whether a complaint

12    alleges grounds for federal subject matter jurisdiction. A motion to dismiss for lack of subject

13    matter jurisdiction will be granted if the complaint on its face fails to allege facts sufficient to

14    establish subject matter jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036,

15    1039 n.2 (9th Cir. 2003). In considering a Rule 12(b)(1) motion, the Court "is not restricted to the

16    face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve

17    factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d

18    558, 560 (9th Cir. 1988). Once a party has moved to dismiss for lack of subject matter jurisdiction

19    under Rule 12(b)(1), the opposing party bears the burden of establishing the court's jurisdiction.

20    *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

21                    **III.    DISCUSSION**

22    **A.    Request for Judicial Notice**

23        The parties filed competing requests for judicial notice, which sought to take judicial

24    notice of a veritable range of documents, including screenshots of archived website product pages,

25    litigation letters, corporate disclosure statements, and filings in other litigation. (Dkt. Nos. 29-2,

26    39.) The parties also filed various objections to each other's requests for judicial notice. (Dkt.

27    Nos. 37, 45.)

28        Generally, a district court may not consider any material beyond the pleadings in ruling on

United States District Court
Northern District of California

7

1    a motion to dismiss for failure to state a claim. *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th

2    Cir. 2001).  A district court may take notice of facts not subject to reasonable dispute that are

3    "capable of accurate and ready determination by resort to sources whose accuracy cannot

4    reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal–Obeso,* 989 F.2d 331,

5    333 (9th Cir. 1993).  "[A] court may take judicial notice of 'matters of public record.'" *Lee*, 250

6    F.3d at 689 (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)).  The court

7    need not accept as true allegations that contradict facts which may be judicially noticed.  *See*

8    *Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

9        To the extent the parties request that the Court take judicial notice of facts contained in the

10   documents at issue, it is not apparent that judicial notice is proper.  For example, it is unclear how

11   the Court could take judicial notice of an archived website product page for the truth of any

12   statements within, which includes assertions such as "We've cancelled stains."  (*See* Dkt. No. 29-

13   3.)  Likewise, it is not apparent that the Court could take judicial notice of facts within a letter to a

14   court requesting leave to file a motion to dismiss, even if that letter was filed on the public docket.

15   (Dkt. No. 38-6.)

16       In any case, the Court only considered the February 16, 2024 notice letter from Plaintiffs'

17   counsel.  (Feb. 16, 2024 Letter, Dkt. No. 29-6.)  "Even if a document is not attached to a

18   complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively

19   to the document or the document forms the basis of the plaintiff's claim."  *United States v. Ritchie*,

20   342 F.3d 903, 908 (9th Cir. 2003).  Here, the February 16, 2025 notice letter served as the

21   prelitigation demand required by the CLRA, as explained in the operative complaint.  (*See* FAC ¶

22   170.)  Thus, incorporation by reference is warranted.  The Court, however, only takes judicial

23   notice of the fact that the letter was filed and that it made certain statements, not for the truth of

24   the contents therein.  The Court declines to take judicial notice of the remaining documents that it

25   did not consider and overrules the remaining objections as moot.

26       **B.    HPL Motion to Dismiss**

27           **i.    Rule 9(b) Standard for Fraud**

28

United States District Court
Northern District of California

Defendants[1] seek to dismiss all of Plaintiffs' claims for failure to satisfy Federal Rule 9(b)'s heightened pleading standard.  (HPL Mot. to Dismiss at 6.)  Because Plaintiffs' claims are grounded in fraud, *i.e.*, the alleged false advertising, Plaintiffs must satisfy Rule 9(b).  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("A plaintiff may allege a unified course of conduct and rely entirely on that course of conduct as the basis of that claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading as a whole must satisfy the particularity requirement of Rule 9(b).").  "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong."  *Id.* at 1124 (cleaned up).  Thus, a plaintiff must allege "the who, what, when, where, and how of the misconduct charged."  *Id.* (internal quotation omitted).

Defendants' primary argument is that Plaintiffs fail to identify the specific advertisements that they saw.  (HPL Mot. to Dismiss at 7.)  Plaintiffs respond that they have adequately identified the advertisements because they have provided examples of the advertisements in addition to describing the experiences of the named Plaintiffs.  (Pls.' Opp'n at 7-8.)  For example, Plaintiff Tanaka relied on before-and-after images and videos on Defendants' Instagram and TikTok, customer reviews, and customer reactions on Defendants' website and on social media, which made Plaintiff Tanaka expect that the products would "instantly and dramatically whiten her teeth after one application."  (Pls.' Opp'n at 7.)

Defendants are correct that typically, "[i]n a deceptive advertising case, Rule 9(b) requires that the plaintiff(s) identify specific advertisements and promotional materials; allege when the plaintiff(s) were exposed to the materials; and explain how such materials were false or misleading."  *Janney v. Mills*, 944 F. Supp. 2d 806, 818 (N.D. Cal. 2013).  Thus, courts have found that pleadings are insufficient where the complaint included a number of representative advertisements, but it was unclear which specific advertisement the plaintiff had seen and relied

---

[1] Because Defendant HI's motion to dismiss "incorporates by reference Defendant HPL's Rule 12(b)(6) motion to dismiss" the first amended complaint, the Court refers to Defendants collectively in discussing Defendant HPL's motion.

United States District Court
Northern District of California

1   upon in making their purchase.  *See Tabler v. Panera LLC*, ."  Case No. 19-cv-1646-LHK, 2020

2   U.S. Dist. LEXIS 114716, at *18-20 (N.D. Cal. June 30, 2020) (finding that allegations that the

3   plaintiff saw store signage and advertisements stating that the defendants' products were "100%

4   clean" were insufficient because the plaintiff did not identify the specific advertisements seen); ;

5   *Brown v. Madison Reed, Inc.*, Case No. 21-cv-1233-WHO, 2021 U.S. Dist. LEXIS 164002, at

6   *28-30 (N.D. Cal. Aug. 30, 2021) (finding that allegations that the plaintiffs relied on false

7   statements claiming that the products were free of ammonia, PPD, and resorcinol were insufficient

8   because the plaintiffs did not identify the specific statements they relied upon before deciding to

9   purchase the products).  Likewise, courts have often found it insufficient to simply point to a

10  particular misleading and fraudulent statement or phrase that appeared in various advertisements.

11  *See also Colgate v. Juul Labs, Inc.*, 402 F. Supp. 3d 728, 746-47 (N.D. Cal. 2019) (finding that the

12  plaintiffs had sufficiently pled that the defendant "materially omitted the difference between the

13  pharmacokinetic effects of its nicotine solution as compared to combustible cigarettes," but that

14  plaintiffs had to identify "specific ads or content on [the defendant's] website" to satisfy Rule

15  9(b)).  Courts have also found it insufficient to merely provide representative advertisements

16  without stating that those were the same advertisements that the plaintiffs saw and relied upon.

17  *See also id.* at 747 (finding that the plaintiffs who stated that they saw unspecified images reposted

18  on a webpage containing 200 images of the defendant's advertisements failed to satisfy Rule 9(b));

19  *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1097 (N.D. Cal. 2021) ("While

20  the complaint adequately alleges that Toyota's misleading advertisements *exist* . . . the complaint

21  fails to establish that Plaintiffs saw, heard, or acted on them.").

22       Like those cases, Plaintiffs complain that Defendants have falsely advertised their products

23  as being able to "instantly and dramatically whiten" teeth.  Plaintiffs further identify the categories

24  of advertisements they saw, such as before-and-after images with "scientists" and "dentists,"

25  images of yellow objects turning white after being coated with purple paint, influencer

26  endorsements, customer reviews, and videos, but do not identify the specific versions of these

27  categories that Plaintiffs saw and upon which they relied.  (*See* FAC ¶¶ 94(a), 95(a), 96(a), 97(a).)

28  Thus, Defendants argue that this case likewise fails.  (HPL Mot. to Dismiss at 7; HPL Reply at 2.)

United States District Court
Northern District of California

1    In the opposition to HI's motion to dismiss, Plaintiffs suggest that they are not required to

2    identify the specific advertisements that they relied on because "they 'allege[] exposure to a long-

3    term advertising campaign.'"  (Pl.'s Opp'n to HI Mot. to Dismiss at 16 (citing *In re Tobacco II*

4    *Cases*, 46 Cal. 4th 298, 328 (2009)).)  In *In re Tobacco II*, the California Supreme Court found

5    that when "a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not

6    required to plead with an unrealistic degree of specificity that the plaintiff relied on particular

7    advertisements or statements." 46 Cal. 4th at 328.  "The question of when to apply the *Tobacco II*

8    exception is not an easy one, and the appellate courts have yet to draw bright lines for its

9    application." *Dodson v. Tempur-Sealy Int'l, Inc.*, No. 13-cv-4984-JST, 2014 U.S. Dist. LEXIS

10   54071, at *20 (N.D. Cal. Apr. 16, 2014).  Rather, courts have generally found the exception to be

11   a "narrow one," with courts having "expressed the fear that over-application of the exception

12   would 'swallow the rule' requiring plaintiffs to plead reliance." *Id.*  Courts have, however,

13   permitted the application of *Tobacco II* where there was an extensive, long-term advertising

14   campaign or a uniform, highly targeted campaign.  *See id.* at *20-21 (applying *Tobacco II* where

15   there were allegations of an extensive advertising campaign lasting at least 7 years); *Gardner v.*

16   *StarKist Co.*, 418 F. Supp. 3d 443, 456-57 (2019) (applying *Tobacco II* where there were

17   allegations of a campaign starting in 1990); *Makaeff v. Trump Univ., LLC*, Case No. 10-cv-940-

18   GPC-WVG, 2014 U.S. Dist. LEXIS 22392 (S.D. Cal. Feb. 21, 2014) (applying *Tobacco II* where

19   there was a uniform, highly orchestrated, concentrated, and targeted promotional campaign).

20   Similarly, California courts have recognized an exception to the requirement that a plaintiff

21   identify the specific advertisement they relied upon "where a claim of fraud is based upon a long-

22   term advertising campaign, which 'may seek to persuade by cumulative impact, not by a particular

23   representation on a particular date[.]'" *Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App.

24   4th 1235, 1262 (2009) (quoting *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35

25   Cal. 3d 197, 219 (1983)); *see also White v. Kids 2, Inc.*, No. CV 22-00861-MWS (JEMx), 2022

26   U.S. Dist. LEXIS 252142, at *27-28 (C.D. Cal. Sept. 26, 2022); *Levay v. AARP, Inc.* 2019 U.S.

27   Dist. LEXIS 81338, No. 17-09041 DDP (PLAx), 2019 U.S. Dist. LEXIS 81338, at *22 (C.D. Cal.

28   May 14, 2019).  Such courts have recognized that the circumstances of the advertising campaign

may make it "impossible" to identify the specific advertisement that persuaded an individual to purchase a product; for example, in *Committee on Children's Television, Inc.*, the plaintiffs had alleged "thousands of misrepresentations in various media over a span of four years -- representations which, while similar in substance, differ in time, place, and detail of language and presentation." 35 Cal. 3d 197 at 217, 219; *see also Morgan*, 177 Cal. App. 4th at 1245-46, 1262 (asserting misrepresentations during a two-year marketing campaign, in which the defendant marketed a premium cell phone for its features while failing to disclose that it would be modifying its network to render that cell phone worthless). In such cases, it was key that plaintiffs allege "that they acted in response to an advertising campaign even if they cannot recall the specific advertisements." *Morgan*, 177 Cal. App. 4th at 1262.

The Court finds that this appears to be a case where Plaintiffs could potentially allege a pervasive, targeted advertising campaign over a period of time, all of which pushes the same message: that Defendants' products will "instantly and dramatically whiten" teeth. For example, Plaintiffs have alleged that Defendants have engaged in a multi-million advertising campaign on social media, targeting females between the ages of 15 and 24. (FAC ¶ 23.) While there do not appear to be allegations of how long this campaign has gone on or how long Plaintiffs were exposed, there are some allegations highlighting the magnitude of the campaign during its duration, including posts of fifteen or more advertisements per day. (FAC ¶ 24.) Similarly, Plaintiff Ledesma alleges seeing approximately sixty advertisements before deciding to purchase the products (FAC ¶ 94(a)); requiring Plaintiff Ledesma to specifically identify each and every one of these sixty advertisements hardly seems practical or practicable.

At the hearing, Plaintiffs also explained the difficulty in identifying the specific advertisements that individuals may have seen. Unlike traditional media advertising, which may have specific versions of a print advertisement or television commercial that can be identified, Plaintiffs noted that Defendants' advertisements include a "seemingly infinite variations of what the ads can look like," with multiple ads including the same video but in different orders. (7/17/25 Hearing Tr. at 31:13-17.) One video may include the yellow rubber duck clip followed by a scientist clip, while another video may have the scientist clip come first followed by the yellow

12

1    rubber duck clip or a yellow banana clip.  (7/17/25 Hearing Tr. at 31:17-21.)  In short, the same

2    yellow rubber duck clip may be in hundreds of different of ads, making it difficult to identify

3    which advertisement an individual may have seen.  (7/17/25 Hearing Tr. at 31:22-32:5.)  Plaintiffs

4    also note the realities of the social media advertising they were exposed to, including being

5    exposed to numerous 30-second or shorter advertisements, each of which may have focused on

6    demonstrating that whitening worked through color-correction technology.  (7/17/25 Hearing Tr.

7    at 32:11-20.)

8        In short, the Court finds that it is necessary to recognize the reality of the type of social

9    media marketing that is occurring in this case, namely the alleged flooding of social media users'

10   feeds with multiple variations of similar videos pushing the same message.  *See In re*

11   *Ethereummax Inv. Litig.*, CV 22-163-MWS (SKx), 2025 U.S. Dist. LEXIS 159470, at *17 (C.D.

12   Cal. Aug. 6, 2025) ("The Court is cognizant that, in contrast to the time at which *Tobacco II* (and

13   even *Makaeff*) were decided, consumers may in fact **be more likely** to be exposed to promotional

14   campaign centered representations via social media platforms than via magazines, television, or

15   even websites hosted by the company defendant.).  Under such circumstances, requiring a plaintiff

16   to identify every variation that they have seen appears near impossible.  To find that Rule 9(b)

17   requires a plaintiff to meet such a high standard would be the same as insulating a defendant from

18   liability simply because they have created so many different types of advertisements that are then

19   repeatedly pushed onto social media users.  This would not be a fair result.  *See In re Oreck Corp.*

20   *Halo Vacuum & Air Purifiers Mktg. & Sales Practice Litig.*, No. ML 12-2317 CAS (JEMx), 2012

21   U.S. Dist. LEXIS 172869, at *41 (C.D. Cal. Dec. 3, 2012) (finding that where the plaintiffs

22   alleged that they "were exposed to a national advertising campaign that utilized several slightly

23   different advertisements all articulating a common allegedly fraudulent message" and the plaintiffs

24   had identified the "clear common message," "it would be unfair to require plaintiffs to recall and

25   specify precisely which of the many advertisements they have [seen] were the particular

26   advertisements they relied upon").

27       That said, the Court also finds that Plaintiffs' complaint is not adequate as currently pled.

28   Rather, Plaintiff must still plausibly allege that this is the type of advertising campaign that would

United States District Court
Northern District of California

13

1   not require them to identify the specific advertisements they viewed.  *See White*, 2022 U.S. Dist.

2   LEXIS 252142, at *31 ("If Plaintiff intends for the claim to be based on a broad advertising

3   campaign, any amended complaint need not specify the precise statements made in those

4   advertisements, but it should state with more specificity 'where,' 'when,' and 'how' Plaintiff

5   encountered such statements and the 'cumulative' effect such messages had on her perception of

6   the product.").  As noted above, Plaintiffs have provided no information about the duration of the

7   advertising campaign at issue or their exposure.  The arguments at the hearing about Defendants'

8   strategy of using the same clip in multiple advertisements are also not in the complaint, nor are

9   Plaintiffs' arguments in their briefs that Defendants' social media accounts include thousands of

10  false advertisements.  (*See* Pls.' Opp'n to HIL Mot. to Dismiss at 16.)

11       Further, while Plaintiffs provide more specific information about the types of video

12  advertisements they saw (*i.e.*, before or after videos, videos with scientists and dentists explaining

13  color theory, and videos demonstrating color theory by wiping off purple paint from yellow

14  objects), some Plaintiffs also assert that they relied on influencer endorsements without identifying

15  who the influencer was and what was stated.  Significantly, Plaintiffs do not appear to allege that

16  *all* influencer endorsements are false, such that every influencer endorsement would constitute

17  false advertising.  (*See* FAC ¶ 51.)  Likewise, some Plaintiffs relied on customer reviews, but do

18  not specify who made these reviews or what they stated.  (FAC ¶¶ 95(a), 97(a).)  Again, Plaintiffs

19  do not allege that *all* positive reviews are fake, nor do they suggest that reviews from real

20  customers would be actionable.  To the extent Plaintiffs intend to rely on influencer endorsements

21  or reviews, Plaintiffs will need to provide sufficient allegations to demonstrate that the

22  endorsements or reviews they relied upon were false.

23       The Court also acknowledges that Defendants make numerous arguments for why their

24  advertisements are not likely to deceive the general public, including whether the advertisements

25  promised "dramatic" whitening of teeth, whether the advertisements included disclaimers that

26  "results may vary," and whether Plaintiffs misconstrued Defendants' advertising.  (*See* HPL Mot.

27  to Dismiss at 10-15.)  Given that the Court finds that Plaintiffs have not adequately alleged the

28  broad advertising campaign necessary to avoid having to identify the specific advertisements at

United States District Court
Northern District of California

1    issue, the Court finds it premature to resolve this issue at this time.

2           **ii.    Falsity of the Statement**

3           In the alternative, Defendants make various arguments for why Plaintiffs cannot

4    demonstrate that the complained of advertisements are misleading.  Again, the Court is not in the

5    position to assess these arguments because Plaintiffs must still allege a broad advertising

6    campaign.

7           To assist with future pleadings and motion practice, however, the Court notes that it is not

8    apparent that claims of "instant" and "dramatic" whitening are actionable under the UCL, CLRA,

9    and FAL, as opposed to non-actionable puffery.  "Ultimately, the difference between a statement

10   of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus. v. Ikon*

11   *Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (internal quotation omitted).  Specifically, "a

12   statement that is quantifiable, that makes a claim as to the specific or absolute characteristics of a

13   product, may be an actionable statement of fact while a general, subjective claim about a product

14   is non-actionable puffery." *Id.* (internal quotation omitted). Whether an alleged misrepresentation

15   is an actionable statement of fact or puffery "is a legal question that may be resolved on a Rule

16   12(b)(6) motion." *Id.*

17          As relevant to this case, "[s]tatements that characterize the speed of an action with terms

18   like 'fast' are frequently held to be puffery." *Perez v. Bath & Body Works, LLC*, Case No. 21-cv-

19   5606-BLF, 2022 U.S. Dist. LEXIS 124992, at *13-14 (N.D. Cal. July 14, 2022) (finding that

20   claims that a product had "a 'fast-absorbing formula' that 'immediately hydrates' the skin" was

21   non-actionable puffery); *Scilex Pharms. Inc. v. Sanofi-Aventis United States LLC*, No. 21-cv-

22   01280-JST, 2022 U.S. Dist. LEXIS 243518, at *24 (N.D. Cal. Feb. 24, 2022) (finding that "the

23   phrase 'fast acting' is subjective, general, and non-quantifiable" for a pain-relief product).

24   Plaintiffs should be prepared to address this case law, including providing authority that supports

25   their assertions that claims of "instant" and "dramatic" whitening are actionable.

26          **iii.    Pre-Suit Notice**

27          Defendants further argue that the CLRA and breach of warranty claims should be

28   dismissed with prejudice because Plaintiffs failed to provide pre-suit notice.  (HPL Mot. to

1     Dismiss at 17.)  "To avoid dismissal of a . . . breach of warranty claim in California, a buyer must

2     plead that notice of the alleged breach was provided to the seller within a reasonable time after

3     discovery of the breach."  *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011) (internal

4     quotation omitted).  Likewise, "the CLRA includes a prefiling notice requirement on actions

5     seeking damages."  *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1259 (2009)

6     (citing Cal. Civ. Code § 1782(a)(2)).  The purpose of providing notice "is to allow the breaching

7     party to cure the breach and thereby avoid the necessity of litigating the matter in court."  *Id.*

8          Here, there is no dispute that Defendants received pre-suit notice per a notice letter on

9     February 16, 2024.  The February 16, 2024 letter, however, was sent by Plaintiffs' counsel but did

10    not specifically identify Plaintiffs in this case.  Rather, the February 16, 2024 letter was sent on

11    behalf of three other individuals, as well as "all other similarly situated," *i.e.*, all persons who

12    purchased Defendants' products for purposes other than resale.  (Feb. 16, 2024 Letter at 1.)  Thus,

13    Defendants argue that because the *named* Plaintiffs failed to provide notice, the CLRA and breach

14    of warranty claims must be dismissed.  (HPL Mot. to Dismiss at 18.)

15         The Court finds that the February 16, 2024 letter satisfies the required pre-suit notice.

16    Courts have repeatedly found that the notice requirement was satisfied under identical

17    circumstances.  For example, in *Nacarino v. KSF Acquisition Corp.*, counsel for the named

18    plaintiff (Ms. Nacarino) sent a notice letter to the defendant KSF on behalf of a different

19    individual (Mr. Houriani) and "others similarly situated."  642 F. Supp. 3d 1074, 1083-84 (N.D.

20    Cal. 2022).  The district court found that the notice letter was adequate because the "letter was sent

21    not only on behalf of Houriani but also 'on behalf of all others similarly situated (the "Class"),'

22    which letter provided KSF with notice of the same claims Nacarino now seeks to bring on an

23    individual and class basis, thereby giving KSF the opportunity to correct the violations alleged in

24    the instant action."  *Id.* at 1084; *see also Vizcarra v. Unilever United States, Inc.*, Case No. 20-cv-

25    2777-YGR, 2020 U.S. Dist. LEXIS 125649, at *10-11 (N.D. Cal. July 16, 2020) ("Nunez's letter

26    provided Unilever with an opportunity to resolve the claims of consumers similarly situated to

27    Nunez, which, again, included Vizcarra and the members of the proposed class in this action.").

28    Defendants cite no authority that only the individuals specifically identified in a pre-notice letter

United States District Court
Northern District of California

16

1    may bring suit; rather, Defendants cite cases where the notice was untimely or failed to identify

2    the product at issue.  *See Ang v. Bimbo Bakers USA, Inc.*, Case No. 13-cv-1196-WHO, 2013 U.S.

3    Dist. LEXIS 138897, at *40-41 (N.D. Cal. Sept. 25, 2013) (dismissing CLRA claim as to products

4    not identified in the notice); *Cattie v. Wal-Mart Stores, Inc*., 504 F. Supp. 2d 939, 950 (S.D. Cal.

5    2007) (dismissing CLRA claim where the plaintiff gave notice after the lawsuit was filed).

6           Here, even if the named Plaintiffs were not specifically identified by the February 16, 2024

7    letter, it still served its purpose of giving Defendants the opportunity to resolve their claims.

8    Defendants' counsel in fact engaged in discussions with Plaintiffs' counsel during the period

9    between the receipt of the February 16, 2024 letter and the filing of the instant litigation.  (Sodaify

10   Decl. ¶¶ 8-13.)  Because notice was adequate, dismissal of the CLRA and breach of warranty

11   claims with prejudice is not appropriate.

12           iv.    **Unjust Enrichment**

13          Finally, Defendants argue that the unjust enrichment claim must be dismissed with

14   prejudice because courts have repeatedly recognized that "California does not recognize a separate

15   cause of action for unjust enrichment."  (HPL Mot. to Dismiss at 19 (internal quotation omitted).)

16   Other courts, however, have rejected the "argument that unjust enrichment is not a standalone

17   cause of action and thus cannot be asserted, because that argument is based on outdated law."

18   *Brooks v. Thomson Reuters Corp.*, No. 21-cv-01418-EMC, 2021 U.S. Dist. LEXIS 154093, at *36

19   (N.D. Cal. Aug. 16, 2021).  Rather, such cases have recognized that "[t]he Ninth Circuit has

20   allowed a claim for unjust enrichment 'as an independent cause of action or a quasi-contract claim

21   for restitution.'"  *Id.* (quoting *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir.

22   2016)).

23          In response, Defendants contend that Plaintiffs cannot bring both an express warranty

24   claim and an unjust enrichment claim based on a quasi-contract.  (HPL Reply at 12.)  Courts,

25   however, have permitted pleading in the alternative where the plaintiffs' express warranty claim is

26   not based on an express contract.  *Sneed v. P&G*, No. 23-cv-05443-JST, 2025 U.S. Dist. LEXIS

27   65365, at *23 (N.D. Cal. Apr. 4, 2025).  Such appears to be the case here; thus, dismissal of the

28

United States District Court
Northern District of California

1    unjust enrichment claim with prejudice is not appropriate.[2]

2         Accordingly, the Court GRANTS HPL's motion to dismiss the unjust enrichment claim for

3    failure to satisfy Rule 9(b).  The dismissal is without prejudice.

4        **C.    HI Motion to Dismiss**

5         HI moves for dismissal on the additional ground that Plaintiffs lack standing to bring their

6    claims against HI, and thus there is no subject matter jurisdiction under Rule 12(b)(1).  (HI Mot. to

7    Dismiss at 1.)  Specifically, HI denies that it creates or publishes the social media advertisements

8    at issue but instead asserts that HPL is responsible for the social media accounts.

9         To establish Article III standing, "a plaintiff must adequately establish: (1) an injury in fact

10   (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a

11   fairly traceable connection between the alleged injury in fact and the alleged conduct of the

12   defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's

13   injury will be remedied by the relief plaintiff seeks in bringing suit)."  *Sprint Communs. Co. v.*

14   *APCC Servs.*, 554 U.S. 269, 273-74 (2008) (cleaned up).  At issue in this case is causation, which

15   requires that the injury is "fairly traceable to the challenged action of the defendant, and not the

16   result of the independent action of some third party not before the court."  *Lujan v. Defenders of*

17   *Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

18        Here, the parties effectively dispute whether Defendant HI is responsible for the

19   advertisements at issue, and thus whether Plaintiffs can establish that their injuries were caused by

20   Defendant HI.  (HI Mot. to Dismiss at 8; Pls.' Opp'n to HI Mot. to Dismiss at 6-7.)  In support of

21   their assertion that Defendant HI is not responsible for the advertisements, Defendant HI relies on

22   the declaration of Jack Carroll, Lead Data Analyst at Defendant HPL.  (Carroll Decl., Dkt. No. 12-

23   3.)  Mr. Carroll stated that HI was formed in May 2023, and is a sister company of HPL.  (Carroll

24   Decl. ¶ 3.)  Mr. Carroll further stated that prior to February 2024, HI was not involved in

25

26   —————————————

27   [2] Defendants also argue that because Plaintiffs have brought the unjust enrichment claim on behalf of a nationwide class, dismissal is required because Plaintiffs do not identify which states' laws apply to the claim.  (HPL Mot. to Dismiss at 20.)  As discussed below, the Court will strike the nationwide class claims, so the Court will not separately discuss whether dismissal is required.

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

Hismile's social media accounts, and that since February 2024, HI's only involvement is fulfilling purchases made on TikTok's retail/shopping platform.  (Carroll Decl. ¶ 5.)  While HI took over operations of Hismile's US website in August 2023, HPL continues to be responsible for the website's content.  (Carroll Decl. ¶¶ 6-7.)  Mr. Carroll affirmatively states that HI "has never had any involvement in creating or managing posts made by any Hismile social media account."  (Carroll Decl. ¶ 5.)

In response, Plaintiffs present evidence that HI was actually formed on June 28, 2019.  (Sodaify Decl., Exh. K.)  Plaintiffs also contend that Defendants represented that HPL is HI's parent company in filings before other courts.  (Pls.' Opp'n to HI Mot. to Dismiss at 5.)  Plaintiffs also generally complain that Defendants' counsel repeatedly failed to request that Defendant HI be removed from the case.  (Id. at 5-6.)  Further, Plaintiffs assert that HI manages multiple social media accounts, including @hismileus on TikTok.  (Sodaify Decl. ¶ 23.)  In support, Plaintiffs point to the @hismileus on TikTok's bio, which states: "The official @hismile TikTok shop account."  (Sodaify Decl. ¶ 23, Exh. L.)  Hismile US's official e-commerce store account on TikTok identifies HI under "Seller info."  (Sodaify Decl., Exh. M.)  This account also contains many of the complained of advertisements at issue in this case.  (Sodaify Decl. ¶ 24.)

The Court finds that at this juncture, Plaintiffs fail to satisfy their burden of showing that federal subject matter jurisdiction exists as to HI.  *See Chandler*, 598 F.3d at 1122 ("The party asserting federal subject matter jurisdiction bears the burden of proving its existence.").  Many of Plaintiffs' factual disputes concern the corporate form of HI, including when it was established and who its parent company is.  Plaintiffs, however, fail to explain how these disputes demonstrate that HI is responsible for the advertisements at issue; for example, whether HI was established in June 2019 or May 2023 does not appear relevant to whether HI created advertisements.[3]  Likewise, Plaintiffs cite no authority that HI was required to explicitly request that it be removed

---

[3] The Court notes that in a supplemental declaration, Mr. Carroll explains that Hismile LLC was formed on June 28, 2019.  (Mar. 21, 2025 Carroll Decl. ¶ 5.)  On May 31, 2023, Hismile LLC executed a certificate of conversion and a certificate of incorporation, thus converting Hismile LLC to HI.  (Mar. 21, 2025 Carroll Decl. ¶ 5.)  Defendants' counsel also states that it mistakenly stated that HPL was HI's parent in its court filing, when in fact HI's parent is Hismile Holdings Pty Ltd.  (HI Reply at 9 n.3.)

1    from the complaint.

2            As to the @hismileus account, Plaintiffs provide no evidence that HI is responsible for the

3    content or management of this account, even if it is the listed seller.  In contrast, Mr. Carroll is

4    clear HI does not have any involvement in creating or managing posts on any social media

5    account, and that HPL is responsible for the content of Hismile's US website.  (Carroll Decl. ¶¶ 5,

6    7.)

7            In the alternative, Plaintiffs argue that they have adequately alleged a "joint venture" to

8    market, advertise, and sell the products, such that both Defendants are responsible for the other's

9    actions.  (Pls.' Opp'n at 10-11.)  As an initial matter, HI correctly points out that Plaintiffs do not

10    appear to raise a joint venture theory of liability in the operative complaint.  (HI Reply at 3.)  In

11    any case, to adequately assert a joint venture theory of liability, a plaintiff "must plead with

12    sufficient factual particularity the following elements: (1) members must have joint control over a

13    venture, even though they may delegate it, (2) members must share the profits of the undertaking,

14    and (3) members must each have an ownership interest in the enterprise." *Fields v. Wise Media,*

15    *LLC*, Case No. 12-cv-5160-WHA, 2013 U.S. Dist. LEXIS 136914, at *11 (N.D. Cal. Sept. 24,

16    2013).  Here, Plaintiffs rely on allegations that Defendants use the same website and social media

17    accounts to sell and advertise their products, and that both Defendants "perpetuate and profit from

18    their fraudulent social media marketing scheme."  (*Id.* (citing FAC ¶ 18-19.)  It is not apparent that

19    these conclusory and general assertions are sufficient; indeed, in both cases relied upon by

20    Plaintiffs, there was affirmative evidence supporting the allegations of a joint venture.  *See Doe v.*

21    *Unocal Corp.*, 67 F. Supp. 2d 1140, 1144 (C.D. Cal. 1999) (finding that the plaintiffs had

22    adequately demonstrated traceability when "[t]aking plaintiffs['] allegations as true, and

23    augmenting those allegations with evidence submitted in support of the instant motion and the

24    earlier motion for injunctive relief"); *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 564 (W.D. Wash.

25    2012) (finding that the plaintiffs had adequately alleged traceability because "[c]ontrary to Papa

26    John's position that it played no role in th[e challenged] decisions, Papa John's has produced

27    documents that indicate that it did play some role in the franchisee-level decisions to hire

28    OnTime4U"); *contrast with Fields*, 2013 U.S. Dist. LEXIS 136914, at *11-12 (finding that

allegations that all of the defendants "shared in the revenue generated" was insufficient, and that "[m]ore specific facts should have been pled about merchant defendants' alleged profit sharing in order to ground a plausible joint venture theory of liability"); *Fan v. NBA Props. Inc.*, Case No. 23-cv-5069-SI, 2024 U.S. Dist. LEXIS 57205, at *4 (N.D. Cal. Mar. 26, 2024) (dismissing defendants because the complaint "does not contain any factual allegations in support of the[ joint venture] elements").

Plaintiffs also request that the Court grant leave to conduct jurisdictional discovery.  (Pls.' Opp'n to HI Mot. to Dismiss at 20.)  The Court finds that jurisdictional discovery may ultimately be appropriate, but not at this time given that Plaintiffs have failed to adequately allege their claims under Rule 9(b).  Thus, the Court is open to revisiting jurisdictional discovery if Plaintiffs are able to satisfy Rule 9(b).

## D.    Defendants' Motion to Strike

Finally, Defendants move to strike the nationwide-class allegations.  (Defs.' Mot. to Strike at 1.)  Again, Plaintiffs are asserting claims for breach of warranty and unjust enrichment on behalf of a nationwide class.  (FAC ¶ 99(e).)

### i.    Proper Procedure

As a threshold matter, Plaintiffs dispute that Rule 12(f) is the proper mechanism to strike the nationwide class allegations.  (Pls.' Opp'n to Defs.' Mot. to Strike at 4-5.)  In general, "motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle for arguments about class propriety."  *Phan v. Sargento Foods, Inc.*, Case No. 20-cv-9251-EMC, 2021 U.S. Dist. LEXIS 103629, at *18-19 (N.D. Cal. June 2, 2021) (internal quotation omitted).  This, however, "does not mean that a motion to strike class claims or allegations cannot be decided at the pleading stage." *Id.* at *19.  Rather, courts will "examine[] the degree of factual development needed to resolve the particular issue.  If the issue is purely legal in nature, then it may make little sense not to wait until class certification proceedings to resolve it given the burdens class certification and other class-related discovery imposes on the parties." *Id.*; *see also Langan v. United Servs. Auto Ass'n*, 69 F. Supp. 3d 965, 988 (N.D. Cal. 2014) ("Nevertheless, courts in this district sometimes strike class allegations with leave to amend

1    when the face of the complaint shows conclusively that the proposed class cannot be certified.").

2           **ii.    Standing**

3           Defendants argue that Plaintiffs lack standing to represent individuals from other states

4    because Plaintiffs are all California residents.  (Defs.' Mot. to Strike at 3-4.)  "Courts in the Ninth

5    Circuit have consistently held that a plaintiff in a putative class action lacks standing to assert

6    claims under the laws of states other than those where the plaintiff resides or was injured."  *Jones*

7    *v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 909 (N.D. Cal. 2019); *see also Pardini v. Unilever*

8    *United States, Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013) ("Here, there is only one named

9    plaintiff, and she has not alleged that she purchased ICBINBS outside of California.  Thus,

10   Plaintiff does not have standing to assert a claim under the consumer protection laws of the other

11   states named in the Complaint.  This is a pleading defect amenable to determination prior to a

12   motion for class certification.").

13          In response, Plaintiffs point to *Melendres v. Arpaio*, which concerned a class-wide

14   injunction that prevented the defendants from making traffic stops based on a car occupant's race

15   both during "saturation patrols" and "nonsaturation patrols."  784 F.3d 1254, 1258-59 (9th Cir.

16   2015).  The defendants argued that because the named plaintiffs were stopped during saturation

17   patrols, the class should be partially decertified and limited to saturation patrols as well.  *Id.* at

18   1256-60.  The Ninth Circuit rejected this argument, finding that the defendants were conflating

19   standing with class certification.  *Id.* at 1261.  Rather, the Ninth Circuit applied a "class

20   certification" approach, which finds that "once the named plaintiff demonstrates her individual

21   standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider

22   whether the Rule 23(a) prerequisites for class certification have been met."  784 F.3d at 1262

23   (internal quotation omitted).

24          Courts have split as to whether *Melendres* requires that a district court "appl[y] the class

25   certification approach to questions of whether class representatives may . . . bring claims arising

26   under state laws where no class representative resided or was harmed."  *Gatling-Lee v. Del Monte*

27   *Foods, Inc.*, No. 22-cv-00892-JST, 2023 U.S. Dist. LEXIS 237333, at *18 (N.D. Cal. Mar. 28,

28   2023).  Based on the Court's review, it appears the majority of courts "at the pleading stage of a

United States District Court
Northern District of California

putative class action, have dismissed sister state claims based on the named plaintiff's standing." *See Jones*, 400 F. Supp. 3d at 910 (citing post-*Melendres* cases). Such courts have explained that *Melendres* "did not confront a situation where named plaintiffs brought claims under the laws of multiple states where they did not reside and where they were not injured." 400 F. Supp. 3d at 909. Rather, *Melendres* concerned a situation where "all plaintiffs alleged that they suffered the same constitutional injury, only in different factual circumstances." 400 F. Supp. 3d at 909. In contrast, where the named plaintiffs "bring claims under the laws of multiple states . . . [the p]laintiffs technically invoke different legally protected interests." *Id.* Additionally, in finding that resolving the standing issue was warranted, such courts have acknowledged "the significant burden of nationwide discovery" in permitting a nationwide class to proceed when obvious standing issues existed. *Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1175-76 (N.D. Cal. 2017); *see also In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) ("The Court has reservations of subjecting the Device Manufacturers to the expense and burden of nationwide discovery without Plaintiffs first securing actual plaintiffs who clearly have standing and are willing and able to assert claims under these state laws.").

Plaintiffs point to *Pecanha v. The Hain Celestial Group*, Case No. 17-cv-4517-EMC, 2018 U.S. Dist. LEXIS 11739 (N.D. Cal. Jan. 24, 2018) and *In re Chrysler-Dodge-Jeep Ecodiesel*, 295 F. Supp. 3d 927 (N.D. Cal. 2018), arguing that Judge Chen deferred the standing issue to the class certification stage. (Pls.' Opp'n to Mot. to Strike at 6.) In *Phan*, however, Judge Chen revisited his prior rulings, finding that "*Melendres* does not impose a per se rule; rather, district courts retain discretion to address standing before or after class certification in the 'sister state' law scenario." 2021 U.S. Dist. LEXIS 103629, at *35. Judge Chen then proceeded to find that it was appropriate to decide the standing issue where "there [we]re substantial variations in the consumer protection laws of the ten states at issue." *Id.* at *37.

As in *Phan*, there are substantial variations in the nationwide claims that have been pled, *i.e.*, breach of warranty and unjust enrichment. The Ninth Circuit has explicitly found that with respect to unjust enrichment, "[t]he elements necessary to establish a claim for unjust enrichment . . . vary materially from state to state." *Mazza v. Am. Honda Motor Co.*, 666 F.3d

United States District Court
Northern District of California

581, 591 (9th Cir. 2012).  While the Ninth Circuit "made this statement in discussing whether, *for choice of law purposes*, there were material differences in state law . . . the Ninth Circuit went on to hold that the laws of the 50 states would apply to the class claim[.]" *Phan*, 2021 U.S. Dist. LEXIS 103629, at *21; *see Mazza*, 666 F.3d at 594.  Thus, courts have stricken nationwide unjust enrichment claims at the pleading stage.  *Id.* at *28; *see also Pistacchio v. Apple Inc.*, Case No. 20-cv-7034-YGR, 2021 U.S. Dist. LEXIS 47071, at *8 (striking nationwide class allegations related to unjust enrichment); *Johnson*, 272 F. Supp. 3d at 1175 ("I have agreed with my colleagues in this district that in analogous cases, *Mazza* is not only relevant but controlling, even at the pleading stage").  This is particularly apt where, like the instant case, the named plaintiffs "seek[] to certify one entire nationwide class involving 50 different state laws, not, *e.g.*, a subset of states grouped into discrete subclasses."  *Phan*, 2021 U.S. Dist. LEXIS 103629, at *25; *see also Johnson*, 272 F. Supp. 3d at 1175 ("opt[ing] to require that plaintiffs present named class representatives who possess individual standing to assert each state law's claims against Nissan").

Plaintiffs cite no authority to the contrary, instead arguing that Defendants' reliance on *Mazza* is premature and that "[a] proper choice-of-law analysis requires a detailed examination of the facts, which cannot be conducted without the benefit of discovery."  (Pls.' Opp'n to Mot. to Strike at 9.)  Specifically, Plaintiffs argue they want discovery to determine if California has significant contacts with the class members.  (*Id.*)  "Under California's choice of law rules, the class action proponent bears the initial burden to show that California has significant contact or significant aggregation of contacts to the claims of each class member."  *Mazza*, 666 F.3d at 589 (internal quotation omitted).  Once this showing is made, "the burden shifts to the other side to demonstrate that foreign law, rather than California law, should apply to class claims."  *Id.* at 590 (internal quotation omitted).  Again, however, the Ninth Circuit has already found that for unjust enrichment claims, the laws of the other states are materially different and would apply to the class claims.  *See id.* at 594.  "It is hard to imagine a clearer directive from our Circuit on this issue." *Pistacchio*, 2021 U.S. Dist. LEXIS 47071 (striking nationwide unjust enrichment claim per *Mazza*).  Thus, even if Plaintiffs establish the initial burden of showing that California has significant contacts to the claims of each class member, Plaintiffs will simply fail at the next step.

United States District Court
Northern District of California

United States District Court
Northern District of California

1     As to the breach of warranty claim, courts in this Circuit have found that there are material

2   differences in state law regarding breach of warranty.  *See Tasion Communs., Inc. v. Ubiquiti*

3   *Networks, Inc.*, 308 F.R.D. 630, 636-37 (N.D. Cal. 2015) (finding that there were material

4   differences for an express warranty claim, including whether privity, pre-litigation notice, or

5   reliance was required); *Tsonev v. Kia Motors Am., Inc.*, No. SACV 16-01020-CJC(DFMx), 2016

6   U.S. Dist. LEXIS 192698, at *14 (C.D. Cal. Nov. 9, 2016) (same); *Darisse v. Nest Labs, Inc.*,

7   Case No. 14-cv-1363-BLF, at *31-32 (same) & *32-33 (finding that for implied warranty claims,

8   there were "significant differences regarding privity, notice, the availability of class actions, and

9   the definition of merchantability").  Defendants also provide a chart comparing the state laws

10   regarding breach of warranty, which show differences in reliance and pre-litigation notice for

11   express warranty claims, as well as differences in statute of limitations, tolling, privity, and

12   damages for implied warranty claims.  (Defs.' Mot. to Strike, Exhs. 1-2.)  Plaintiffs do not dispute

13   that there are differences; instead, Plaintiffs argue that these are simply generalized differences

14   that Defendants are not connecting to the claims or facts of this case.  (Pls.' Opp'n at 11.)

15   Plaintiffs provide no explanation in support, and it is unclear how the specific facts of the case

16   would affect whether the law of the fifty states is materially different, thus affecting whether

17   Plaintiffs have standing to represent individuals from other states. Plaintiffs also argue that

18   Defendants have failed to demonstrate that these differences are "incapable of being addressed

19   through established procedural tools such as subclasses." (*Id.*)  But Plaintiffs have not proposed

20   subclasses; they have only proposed a single nationwide class that would likely encompass

21   individuals from every state.  "The fact that an unknown subset of [their] class may exist for which

22   conflict of laws problems will not arise does not cure his current complaint."  *Tsonev*, 2016 U.S.

23   Dist. LEXIS 192698, at *15.

24     Accordingly, the Court finds that there are substantial variations in state law as to the

25   nationwide claims, such that Plaintiffs lack standing to bring suit on behalf of a nationwide class.

26   Because the Court finds that Plaintiffs lack standing, it need not consider Defendants' other

27   arguments regarding whether the Court may exercise personal jurisdiction over nonresident

28   plaintiffs or that the choice-of-law analysis results in issues of predominance for class certification

purposes (much of which overlaps with the above discussion).  Thus, the Court GRANTS Defendants' motion to strike the nationwide class allegations on this basis.  In so finding, the Court does not suggest that Plaintiffs could not allege a narrower class, such as a class limited to states that have laws like that of California.  Nor does the Court suggest that Plaintiffs could not identify additional named plaintiffs to represent class members in other states.  *See Johnson*, 272 F. Supp. 3d at 1176.  At this point, however, the Court finds that Plaintiffs have failed to establish standing to maintain a nationwide class action.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS HPL's motion to dismiss without prejudice, GRANTS HI's motion to dismiss without prejudice, and GRANTS Defendants' motion to strike the nationwide class allegations without prejudice.

Plaintiffs may file an amended complaint within **thirty days** of the date of this order.

IT IS SO ORDERED.

Dated: September 23, 2025

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California

26